THE HONORABLE James Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WEYERHAEUSER NR COMPANY,<br><br>Petitioner,<br><br>v.<br><br>PREMIER IEC, LLC,<br><br>Respondent. | No. 19-928<br><br>ORDER CONFIRMING ARBITRATION AWARD<br><br>[PROPOSED] |

The Court, having considered Petitioner Weyerhaeuser NR Company's Petition to Confirm Arbitration Award, and attachments thereto, ~~Respondent Premier Inc., LLC's opposition to the petition for confirmation, Petitioner Weyerhaeuser NR Company's reply memorandum~~, and other relevant records on file in this matter, and being fully advised in the premises, now, therefore, it is hereby

ORDERED that Petitioner Weyerhaeuser NR Company's Petition to Confirm Arbitration Award be, and the same hereby is, GRANTED, and it is further

ORDERED that the Award and Findings of the Arbitrator dated March 11, 2019, in the arbitration proceedings between Weyerhaeuser NR Company and Premier IEC, LLC

ORDER CONFIRMING ARBITRATION
AWARD (Case No. 19-928 –1

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

a copy of which is attached hereto as **Exhibit A**, be, and the same hereby is, CONFIRMED.

DATED this 21ˢᵗ day of October, 2019.

_____
United States District Judge

Presented by:

s/*Zachary E. Davison*
s/*James F. Williams*
James F. Williams, WSBA No. 23613
Zachary E. Davison, WSBA No. 47873
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
E-mail: jwilliams@perkinscoie.com
E-mail: zdavison@perkinscoie.com
Attorneys for Petitioner Weyerhaeuser NR Company

ORDER CONFIRMING ARBITRATION
AWARD (Case No. 19-928 –2

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

01576-0395/LEGAL144228820.1

# EXHIBIT A

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION TRIBUNAL

---

In the Matter of the Arbitration between:

WEYERHAEUSER NR COMPANY,

            Claimant,           AAA Case No. 01-18-0003-1489

vs.

PREMIER IEC, LLC,

            Respondent.

---

### FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and made effective May 1, 2017, having been duly sworn, having duly heard the proofs and allegations of the parties, and having fully examined all of the submissions, proofs and allegations of the parties, do hereby, FIND and issue this **Final Award,** as follows:

    I.    **INTRODUCTION AND PROCEDURAL STATEMENT.**

**Appearances.** Mr. James F. Williams and Mr. Jeffery S. Clackley, Perkins Coie, LLP, appeared on behalf of Claimant WEYERHAEUSER NR COMPANY ("Weyerhaeuser"), and were joined at the Arbitration Hearing by Claimant's in-house counsel, Mr. Conrad Smueker. As discussed in more detail below, Mr. James Elgin appeared briefly on behalf of Respondent PREMIER IEC, LLC ("Premier") and participated in some of the planning for the initial AAA Administrative Conference held on September 7, 2018, but did not appear at or otherwise participate in that conference. No further appearance was made in the arbitration by Mr. Elgin or by any other representative of Premier.

**Parties.** Claimant Weyerhaeuser owns and manages timberlands; it also manufactures wood products for home and commercial construction. Weyerhaeuser's operations include a lumber mill located in Dierks, Arkansas. Respondent Premier is an electrical contracting firm organized under the laws of Texas.

**The Parties' Contract.** In 2015 Weyerhaeuser announced that it planned to undertake a large project to modernize the Dierks mill. As part of the Dierks mill project, Weyerhaeuser contracted with Premier for provision of certain electrical services and materials. More specifically, Weyerhaeuser and Premier entered into Contract No. DAMP 10198 effective May

Final Award – 1

1, 2017 (Ex. C-1; "the Contract"). The contents of that Contract are discussed in more detail below.

**The Parties' Arbitration Agreement.** Article 25 of the Contract contains the parties' dispute resolution agreement, which provides in relevant part as follows:

> Any dispute between the parties regarding this Contract, including a dispute over a party's performance of its obligations or interpretation of the Contract's terms, other than a dispute when a remedy sought in good faith is injunctive relief, will be addressed as follows: (i) the party initiating dispute resolution will present a written explanation of the dispute and the remedy requested; and (ii) within 10 business days after receiving such notice, the other party will respond by either agreeing to the requested remedy, proposing a different remedy, or explaining why the issue does not justify any remedy. If the matter is not settled within 10 business days after after the response is received by the initiating party or if no response is provided, the dispute will be settled by binding arbitration upon the initiation of either party. . . Arbitration will be administered by the American Arbitration Association under its Commercial Arbitration Rules . . . The arbitration will be held in Seattle, Washington. . ..

**Pleadings.** Claimant submitted its Demand for Arbitration to the AAA on August 17, 2018. In brief, the Demand alleged that Respondent Premier breached the Contract by failing to provide promised services and materials.

**Procedural Summary.** AAA notified the parties on October 11, 2018, that it had appointed me to serve as the undersigned arbitrator in this matter, and invited the parties to submit any objections to the appointment. No objections were received. The Arbitration Tribunal was formally constituted on October 22, 2018, with confirmation by the AAA of my appointment.

Subsequently, and pursuant to notice, a telephonic Preliminary Hearing was held in this arbitration on November 20, 2018. The following determinations were made at that hearing:

- The basis for arbitrability of this dispute was identified as Article 25 of the Contract (partially quoted above);
- The AAA's Commercial Arbitration Rules, as amended and effective October 1, 2013 ("Rules"), as supplemented by the Procedures for Large, Complex Commercial Disputes ("LCC Procedures") were designated as the applicable arbitral rules governing this proceeding;
- I found that Respondent had been given "due notice" of the pendency of this arbitration and of the scheduled date and time for the Preliminary Hearing, and that, after such due

notice, Respondent having failed to be present at or obtain a postponement of the Preliminary Hearing, pursuant to Section R-31 of the Rules it was appropriate to proceed with the Preliminary Hearing in Respondent's absence;

- I separately directed both AAA and the Claimant to give future notices to Respondent sufficient to ensure that Respondent would be given "due notice" within the meaning of Section R-31 of the contents of Procedural Order No. 1, and of other future developments and hearings in the case;
- I determined that the applicable substantive law in this case is the law of the State of Arkansas, and that the applicable arbitration statute is the Federal Arbitration Act, 9 U.S.C. §1, *et seq.*;
- Certain requirements were imposed concerning the pleadings and any future amendments that might be sought (*see* Rules, Section R-6);
- I set the schedule for pre-hearing submissions in advance of the Arbitration Hearing;
- Formal notice was given of the date, time and place of the Arbitration Hearing (February 21, 2019, at my office in Seattle, Washington), and AAA was also directed to issue a separate Notice of Hearing to the same effect;
- I gave certain instructions as to how the Arbitration Hearing would be conducted (*see* Rules, Section R-34) and the form of the award to be issued (*see* Rules, Section R-46); and
- The parties were notified that all of the deadlines set in the Order would be strictly enforced.

A more complete account of the Preliminary Hearing was set out in Procedural Order No. 1, issued on November 20, 2018.

As directed in Procedural Order No. 1, on November 26, 2019, the AAA gave all parties formal notice by certified mail of the contents of that Order and of the scheduled Arbitration Hearing date and locale.

Subsequently, in preparation for the Arbitration Hearing, and pursuant to the schedule set in Procedural Order No. 1, Claimant timely submitted a pre-hearing brief arguing its positions on the claims in dispute, and appending advance copies of its proposed Arbitration Hearing Exhibits C-1 through C-30, copies of certain legal authorities on which it relied, and sworn Declarations of witnesses Jeffery Clackley, Russell Daniel, Thomas Harrison and Darla O'Sullivan. Copies of these materials were sent to Respondent at the same time the materials were sent to me, and were also posted on the AAA website for this case, as described below. On February 19, 2019, Claimant also submitted a supplemental declaration of Mr. Clackley, which was also posted on the AAA website for this case.

**The Arbitration Hearing.** Pursuant to notice as described above, in keeping with the schedule established in Procedural Order No. 1, and as reiterated in the separately-issued Notice of Hearing sent out by the AAA on November 26, 2019, the Arbitration Hearing in this matter was held and completed at my offices in Seattle, Washington, USA on February 21,

2019. Respondent PREMIER IEC, LLC did not request a postponement of the hearing prior to its scheduled date and did not appear at or otherwise participate in the hearing. Following the presentation of evidence at the Arbitration Hearing, I determined that the evidentiary record had been completed as to all issues to be addressed in the Final Award, and declared the hearing closed as of February 22, 2019. (*See* Rules, Section R-39). A complete account of the Arbitration Hearing was set out in Procedural Order No. 2, issued on February 22, 2019.

The matter was submitted for decision as of February 22, 2019, the date the hearings were declared closed.

## II. FINAL AWARD.

My Final Award in this matter is as follows:

### A. FACTUAL DETERMINATIONS RELEVANT TO THE MERITS.

The following is a statement of those facts I find to be true and necessary to this Final Award on the merits of the issues raised by the claims in this case.

1. Claimant Weyerhaeuser and Respondent Premier entered into a binding legal agreement ("the Contract;" Ex. C-1) designated Contract No. DAMP 10198 and made effective May 1, 2017. The Contract obligated Premier to perform a specified scope of work at the Dierks mill project (*see* Contract, Exhibit A, "Scope of Work") in return for a lump sum price without tax of $3,445,440.56 (*see* Contract, Exhibit A, p. 16).[1] Ten percent (10 %) of the lump sum price was to be paid at execution of the Contract. Another ten percent (10 %) was to be withheld and paid only "after all punch list work and acceptance takes place." The remaining eighty percent (80%) was to be paid piecemeal in progress payments "subject to the completion of the purchase of materials and labor incurred against the schedule scope every two to four weeks," and also subject to certain documentation and invoicing requirements. (*See* Contract, Exhibit A, p. 16.) Article 18 of the Contract obligated Premier to keep the Weyerhaeuser property free of liens. Article 24 provided that Arkansas law shall govern interpretation and enforcement of the Contract. Article 25 set out the parties' dispute resolution agreement (partially quoted above). Article 26 provided that the Contract is a fully integrated agreement that "contains the entire understanding of the parties regarding the subject matter of the Contract and supersedes all prior and contemporaneous negotiations and agreements, whether written or oral, between the parties regarding the subject matter of the Contract." (Contract, p. 10; emphasis omitted.) Exhibit A similarly provided that "the Contract shall take precedence over any discrepancies between the documents listed" in that exhibit. (Contract, p. 16.) At the time of contracting, Weyerhaeuser and Premier were both commercially sophisticated contracting parties with substantial prior experience in construction-related contracting matters. In Article 27, the parties represented that "they have

---

[1] The original scope of work was later modified in certain respects by change orders, as authorized under Articles 1, 6 and 7 of the Contract.

Final Award – 4

negotiated and understand its [the Contract's] provisions and agree that no presumptions should be made against the drafter." (Contract, p. 10.)

2. The Contract's scope of work constituted part of the "Phase II Electrical Installation" work, which in turn constituted an important component of the overall Dierks plant modernization project. In its entirety that project required an investment of more than $190 million by Weyerhaeuser, and required careful sequential scheduling of work to be done by many different contractors, including Premier as one of many, on the project. Completion of the scope of work specified in the Contract, and completion of that work on the promised schedule, was required to allow the larger project to proceed in an orderly and cost-efficient manner. For this reason, prior to entering into the Contract Weyerhaeuser sought bids for the Contract's scope of work from multiple bidders and carefully vetted with Premier the assumptions built into Premier's winning bid and Premier's understanding of the scope of work and project schedule.

3. Premier started work under the Contract in June 2017. By early April 2018 Weyerhaeuser became concerned that Premier would not be able to complete the agreed scope of work on the promised schedule; Weyerhaeuser requested that Premier increase the manpower it had assigned to the project in order to catch up. Premier initially indicated a willingness to do so but also hinted that it was having internal financial problems. In late April 2018 Premier demanded that Weyerhaeuser make an unscheduled and unearned progress payment of $199,577. In approximate terms, payment of that amount at that time would have brought total compensation paid to Premier to more than 90% of the agreed lump sum price specified in the Contract at a time when little more than 70% of the Contract's scope of work had been performed. Weyerhaeuser responded that a payment in that amount was not due under the Contract and had not been earned by the work completed to date. In response, at a meeting on April 26, 2018, Premier asserted various interpretations of the Contract that, as discussed below, cannot be reconciled with its plain language, demanded payment of the $199,577 to cover only work done through April 30, 2018, and stated its position that any work done after May 31, 2018, would have to be compensated from payments outside the Contract's lump sum amount at the rate of an additional $165,000 per month. Premier also stated that if its demands were not met it would walk off the job altogether ("pack up" and "be demobilized from the project" by 6 pm April 28, 2018; Exs. C-2, C-3).

4. During the parties' discussions Premier, relying on certain pre-Contract bid minutes and other extrinsic evidence, attempted to justify its demands by arguing that the Contract should be construed as limiting the agreed scope of work to the work that could be completed in a 42 week total time period. This argument was entirely without merit. The Contract plainly and unambiguously provided for an agreed lump sum payment to complete the agreed scope of work, and did not limit the scope of work to 42 weeks or any other similar time constraint. The Contract also expressly and unambiguously stated that it was a fully integrated agreement, and that its terms superseded prior negotiations and take precedence over extrinsic documents, such as the bid minutes. (Contract, Art. 26 and Ex. A at p. 13.)

Final Award – 5

5.      Weyerhaeuser did not agree that Premier had a valid contractual basis for its demands but was desperate to keep Premier from walking off the job, which would have imperiled the timely and cost-efficient completion of the entire Dierks mill project. Ultimately, Weyerhaeuser agreed to, and on April 27, 2018, did, make the $199,577 payment demanded by Premier, "under protest" (Testimony of Russell Daniel) and on the conditions that Premier agree to stay on the job and that the parties would have additional discussions about completing the scope of work. Premier continued working during May 2018 and the parties entered into such discussions.

6.      On May 31, 2018, the parties entered into an additional agreement ("the Extension Agreement;" Ex. C-5). In summary, Premiere agreed in that agreement to complete the contractual scope of work by August 2018 and Weyerhaeuser agreed to pay Premier a flat rate of $152,000 per month for each of June, July and August 2018.

7.      Four days later, on June 4, 2018, Premier walked off the job "due to unforeseen business complications." (Ex. C-6: "Premier IEC will be withdrawing from the Dierks site today June 4, 2018, due to unforeseen business complications. Premier will be unable to return to Dierks, so is releasing Weyerhaeuser from any obligation to Premier. Premier IEC will also be releasing its employees at the site, and they will be available for hire by the replacement contractor"). On that same day, Premier separately notified Weyerhaeuser that one of Premier's suppliers, Graybar Electric Company ("Graybar"), had filed a lien on the Dierks mill because Premier had failed to pay Graybar for materials and labor supplied to Premier for use on the Dierks project. Premier attempted to justify its breach of the Extension Agreement (Ex. C-13) by analogizing its withdrawal to exercise of a "cooling off" period that, under Arkansas law, allows consumers to cancel certain kinds of contracts. As discussed more fully below, this attempted justification was without legal merit. Premier was an experienced and sophisticated commercial entity, not a consumer. The Extension Agreement was a commercial, not a consumer, contract. The Extension Agreement, by its terms, contained no provision authorizing a "cooling off" period and did not grant Premier any similar sort of post-execution right of cancellation.

8.      In order to complete the scope of work promised under the Contract and the Extension Agreement Weyerhaeuser was forced to quickly hire four replacement electrical contractors – South Ark Electric, ICOR Construction, H&K Electric and H&H Electric – in order to keep the larger Dierks project on schedule. All of these replacement electrical contractors agreed to make themselves available only on a time-and-materials basis rather than under a lump sum contract. Paying for the remaining scope of work to be done on a time-and-materials basis rather than under the lump sum price terms promised by Premier imposed substantial additional total expense on Weyerhaeuser. The replacement contractors' time-and-materials charges to complete the remaining scope of work totaled $5,067,432.41. In the circumstances, it was reasonable for Weyerhaeuser to secure the replacement contractors on the terms set out in their contracts in order to avoid even larger losses that otherwise would have been caused to the Dierks project by Premier's conduct in suddenly abandoning the work. After Premier abandoned the project, and pursuant to Change Order No. 6, Weyerhaeuser withheld

Final Award – 6

and did not pay Premier $406,730 of the Contract's lump sum price. Accordingly, Weyerhaeuser's total damages incurred to secure replacement contractors to finish the contractual scope of work totaled $4,660,702.41.

9. Weyerhaeuser was served with Graybar's notice of lien on June 5, 2018. The amount of the Graybar lien is $766,397.50. In the weeks that followed three other suppliers (Ozark Steel, BlueLine Rental and Elliot Electrical Supply) filed additional lien notices due to Premier's failure to pay them. Altogether, the liens claimed by these four unpaid suppliers totaled $1,036,014.64. Although Premier initially assured Weyerhaeuser that Premier would pay off all of its suppliers, as of this date Premier has not satisfied any of those liens. (Daniel Testimony, Exs. C-7 through C-11.)

10. On August 13, 2018, Graybar filed a lien foreclosure action against both Premier and Weyerhaeuser in Howard County Circuit Court in Arkansas. That suit was subsequently removed to federal court, where it is now pending as *Graybar Elec. Co. v. Weyerhaeuser Co. and Premier IEC, LLC,* No. 4:18-cv-04128-SOH (W.D. Ark., filed Sept. 11, 2018) ("the Graybar Lien Foreclosure Action"). Notwithstanding the requirements of Ark. Code Ann. § 18-44-124(a), Premier did not defend Weyerhaeuser in that action. Rather, it failed to appear and allowed a default judgment to be entered against Premier. (Ex. C-19.) As a result, Weyerhaeuser has been obliged to undertake defense of the Graybar Lien Foreclosure Action. Weyerhaeuser has incurred legal expenses and attorneys' fees in order to defend itself in the Graybar Lien Foreclosure Action. To date, those fees and expenses total $8,251.56. I find the amount of those fees and expenses to be reasonable in amount.

11. To date Weyerhaeuser has incurred attorneys' fees and other litigation expenses attributable to this arbitration totaling $120,222.03, exclusive of arbitration fees, expenses and compensation provided in Sections R-53, R-54 and R-55 of the Rules (discussed separately below). I find the amount of those fees and expenses to be reasonable in amount.

12. Premier's conduct described above constituted material breaches of both the original Contract and of the Extension Agreement. More specifically, when Premier abandoned the project on June 4, 2018, it materially breached both the original Contract and the Extension Agreement because its promised scope of work was not complete; indeed, at the time of the breach Premier had not yet even started work on the two largest electrical areas (Primary Breakdown and Infeed and the Gang Saw) and had done only minimal work in other important areas of the scope of work. Premier's abandonment of the project constituted "that party's intentional act[] or omission[]" within the meaning of Article 16 of the Contract. Premier's conduct also separately and materially breached Article 18 of the Contract, which required Premier to "keep Weyerhaeuser's property fee of liens." (Contract, p. 7.)

13. I find that the evidence submitted by Claimant was reasonable, reliable and sufficient for the purpose of quantifying Weyerhaeuser's total damages suffered to date by reason of Premier's breaches of contract. Based on that evidence, and taking into account the damages described in paragraphs 8 and 10 above, I find that Weyerhaeuser has suffered total

damages to date in the amount of $4,668,953.90 as the direct result of Premier's breaches of the parties' contracts. This figure constitutes the total amount of damages Weyerhaeuser has incurred to date to complete the Contract's scope of work less the amount it would have paid Premier if no breach had occurred. These damages flowed directly and immediately from Premier's breaches of the parties' Contract and Extension Agreement, and were the natural and proximate result of those breaches. An award in that amount is necessary to put Weyerhaeuser in the position that it would have been in if Premier had not committed those breaches of the contracts. Based on my finding in paragraph 12 above that Premier's abandonment of the project constituted an intentional act or omission within the meaning of Article 16 of the Contract, that Article would not have barred Weyerhaeuser from also seeking consequential damages, such as lost profits or revenues, by reason of Premier's breach. Weyerhaeuser did not do so, however; accordingly, the total damages award made in this Final Award - $4,668,953.90 - does not include any component for incidental, consequential or punitive damages, loss of profits or loss of revenue.

14. It is likely that Weyerhaeuser may incur additional litigation fees and expenses if the Graybar Lien Foreclosure Action proceeds to trial after this date. That case also confronts Weyerhaeuser with the risk of a possible judgment against it for the lien amount, and possible claims for Graybar's attorneys' fees and costs under Ark. Code Ann. § 18-44-128(a). Weyerhaeuser may also face similar claims, and incur similar future legal fees and expenses, with respect to the other liens placed on the Dierks mill. See paragraph 9 above. It is not appropriate at this time to award money damages attributable to such possible future damages, fees and expenses that may or may not come due against Weyerhaeuser in the future, and Weyerhaeuser's Arbitration Brief did not seek such an award. As discussed below, however, Weyerhaeuser has sought (*see* W. Arbitration Br., at 13-14) declaratory relief relating to such future liabilities, and that request is granted below.

15. The evidence presented at the Arbitration Hearing was sufficient to support the factual findings made above. (Sworn testimony of witness Russell Daniel; sworn written Declarations of Jeffery S. Clackley dated January 28, 2019, Russell Daniel dated January 23, 2019, Thomas Harrison dated January 28, 2019, Darla O'Sullivan dated January 23, 2019 and the Supplemental Declaration of Jeffery S. Clackley dated February 19, 2019; and documentary Exhibits C1-C30, all of which were admitted into evidence).

16. To the extent that any of the determinations made below include or constitute factual determinations relevant to the merits of this dispute they are also included here by this reference.

B. **FACTUAL AND LEGAL DETERMINATIONS RELEVANT TO THE DECISION TO ALLOW THE ARBITRATION TO PROCEED IN THE ABSENCE OF RESPONDENT PREMIER PURSUANT TO SECTION R-31 OF THE RULES.**

1. Weyerhaeuser complied with the Contract's pre-arbitration dispute resolution procedural requirements (Contract, Article 25, partially quoted above) by sending a written

Final Award – 8

explanation of the dispute and requested remedy to Premier on July 17, 2018. (Ex. C-12). James Elgin, President of Premier, responded on August 2, 2018, disagreeing with all of the remedies previously requested by Weyerhaeuser. (Ex. C-13). Thus, as of August 2, 2018, Premier had actual notice of the pendency and content of the present dispute, and of the fact that Weyerhaeuser intended to seek arbitration of the dispute.

2. Weyerhaeuser initiated this proceeding by filing its Demand for Arbitration on August 17, 2018. (Ex. C-15). Premier received actual notice of the filing of the Demand for Arbitration and also participated in preliminary arbitration matters with the AAA's administrative staff; for example, Premier's Mr. Elgin responded more than once to emails from the AAA staff to set the date of the initial telephonic administrative conference in the arbitration. (Ex. C-16, Elgin email dated September 4, 2018 and also acknowledging an earlier communication by Premier to AAA about the case). Thus, as of September 4, 2018, Premier had both actual and due notice of the pendency of the arbitration

3. Premier discontinued its participation in the arbitration at some point between September 4, 2018 and September 7, 2018, the date of the initial telephonic administrative conference, which Premier did not attend. Premier has not appeared or participated in any of the proceedings in the arbitration since then.

4. At the telephonic Preliminary Hearing held in this matter on November 20, 2018:

> ...the American Arbitration Association ("AAA") Director of ADR Services responsible for this case [and] ... and counsel for Claimant separately summarized their respective prior efforts to give due notice to Respondent of the pendency of this arbitration and of today's Preliminary Hearing. They reported that these efforts included (i) direct communications with Respondent about the dispute during the pre-arbitration negotiation phase mandated by §25(a) of the Contract, (ii) prior email communications concerning the filing of the arbitration and scheduling of the Preliminary Hearing, and (iii) certified mail notices to all available addresses for Respondent, including the address specified in the Contract and the address provided by the relevant Secretary of State's office (Arkansas), of the filing of the arbitration and scheduling of the Preliminary Hearing.

(Procedural Order No. 1, at pp. 1-2). Based on those reports, I found that "Respondent has been given 'due notice' of the pendency of this arbitration and of the scheduled date and time for the Preliminary Hearing. I further find that, after such due notice, Respondent failed to be present at or obtain a postponement of the Preliminary Hearing and that, pursuant to Section R-31, it was appropriate to proceed with the Preliminary Hearing in Respondent's absence." (Procedural Order No. 1, ¶3) and entered the following direction:

Final Award – 9

> I hereby direct [AAA staff] to give notice by certified mail to Respondent at all known addresses for Respondent of the issuance of this Procedural Order and of all subsequent Orders, Hearing Notices, and similarly formal notices issued in this arbitration, and to document all such efforts to contact Respondent for presentation of such documentation at the Arbitration Hearing. I further direct counsel for Claimant to separately provide a copy of all Orders, communications and submissions made by or to me in this arbitration by all appropriate means, including certified mail to all known addresses for Respondent, including the notice address given in the Contract and the address provided by the relevant Secretary of State's office, and to document such efforts in Claimant's submission to be made in advance of the Arbitration hearing, as described below. I find that such efforts will constitute "due notice" as that term is used in Section R-31 of the Rules.

(Procedural Order No. 1, ¶4).

5. Both AAA staff and counsel for Claimant separately complied with this direction. In particular, AAA sent copies of Procedural Order No. 1, which set the Arbitration Hearing date and locale for this case and provided that the schedule set in the case would be strictly enforced, and a separate formal Notice of Hearing with the date and locale of the scheduled Arbitration Hearing, by regular and certified mail on November 26, 2018. Separately, counsel for Claimant also sent via certified mail, return receipt requested, copies of Procedural Order No. 1 and the Notice of Hearing, and certain other AAA correspondence, to Premier at multiple addresses. In response, Claimant's counsel received certified mail receipts signed by James Elgin, President of Premier, and William Byers, Premier's Vice-President, along with two other receipts signed by other Premier employees at Premier's Kermit, Texas, and Webster, Texas, locations. (Declaration of Jeffery S. Clackley, ¶¶3-6, Exs. C-21, C-28). Accordingly, I find that Premier had both actual and "due" notice of the date, starting time and locale of the scheduled February 21, 2019, Arbitration Hearing on or before December 15, 2018.

6. On January 29, 2019, counsel for Claimant sent Premier via certified mail, return receipt requested, copies of its Arbitration Brief, its proposed hearing exhibits C1-C30, and the sworn Declarations of Jeffery S. Clackley dated January 28, 2019, Russell Daniel dated January 23, 2019, Thomas Harrison dated January 28, 2019, Darla O'Sullivan dated January 23, 2019. (Ex. C-27). On February 19, 2019, Claimant submitted (and AAA posted on its Webfile for this case) the Supplemental Affidavit of Jeffery S. Clackley, which contains photocopies of certified mail receipts for that mailing signed by William Byers, Premier's Vice-President, along with four other receipts signed by other Premier employees at Premier's Houston, Texas, Webster, Texas, League City, Texas, and Lowell, Arkansas locations. Accordingly, I find that Premier had both actual and "due" advance notice of the above-listed evidentiary materials to be offered by

Final Award – 10

Claimant, and of the specific arguments and requests for relief to be presented by Claimant, at the Arbitration Hearing at least two weeks prior to the commencement of the hearing.

7. Respondent Premier did not request a postponement of the Arbitration Hearing prior to its scheduled date and did not appear at or otherwise participate in the hearing. Section R-31 of the AAA's Commercial Arbitration Rules provides that "an award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award." Accordingly, I required Claimant to submit evidence in support of its claims at the February 21, 2019, Arbitration Hearing. In response to that direction, Claimant called Russell Daniel to give sworn testimony. Claimant also offered documentary Exhibits C1-C30, and the sworn Declarations of Jeffery S. Clackley dated January 28, 2019, Russell Daniel dated January 23, 2019, Thomas Harrison dated January 28, 2019, Darla O'Sullivan dated January 23, 2019 and the Supplemental Declaration of Jeffery S. Clackley dated February 19, 2019, all of which were admitted into evidence. (*See* Rules, Section R-34.) Claimant also argued its case in an oral presentation by counsel. As discussed above, I find that the evidence presented was sufficient for the making of this Final Award.

8. Procedural Order No. 2 summarized the Arbitration Hearing, and contained the following direction:

> **Notice of this Order to Be Given to Respondent.** As directed previously (*see* Procedural Order No. 1, ¶4, I hereby direct [AAA staff] to give notice by certified mail to Respondent at all known addresses for Respondent of the issuance of this Procedural Order. I further direct counsel for Claimant to separately provide Respondent with a copy of this Order by certified mail to all known addresses for Respondent, including the notice address given in the parties' Contract (*see* Procedural Order No. 1, ¶1) and the address provided by the relevant Secretary of State's office. I find that such efforts will constitute "due notice" of the issuance of this Order as that term is used in Section R-31 of the Rules.

(Procedural Order No. 2, ¶3). AAA staff complied with this direction on February 26, 2019.

9. Section R-31 ("Arbitration in the Absence of a Party or Representative") of the Rules provides:

> Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such

Final Award – 11

evidence as the arbitrator may require for the making of an award.

10. Based on the facts of this particular case, as found above, I find that it was appropriate for this arbitration to proceed to issuance of this Final Award in the absence of Respondent Premier. I further find that Premier, after receiving both actual and "due" notice, failed to be present and failed to obtain a postponement. Finally, I find that this Final Award is not made solely on the default of Respondent Premier. Rather, Claimant was required to and did submit such evidence in support of its claims as I required and deemed sufficient.

### C. LEGAL DETERMINATIONS RELEVANT TO THE MERITS.

Claimant bears the burden of proof by a preponderance of the evidence. Arkansas law applies, as provided in the Contract, Article 24.

1. To the extent that the determinations made above include or constitute legal determinations they are also included here by this reference.

2. The evidence submitted by Claimant Weyerhaeuser proved "the existence of an agreement, breach of the agreement, and resulting damages." *Ultracuts Ltd. v. Wal-Mart Stores, Inc.*, 33 S.W.3d 128, 133-34 (Ark. 2000)(citation omitted). *See also Keith Capps Landscaping & Excavation, Inc. v. Van Horn Construction, Inc.*, 2014 Ark. App. 638, 448 S.W.3d 207(23014)(*citing cases*). In particular, as discussed in more detail in Part II.A above, Weyerhaeuser's evidence established that the Contract and Extension Agreement were binding and enforceable contracts, that Premier's conduct constituted material breaches of those agreements, that those breaches caused Weyerhaeuser to suffer resulting monetary damages in the amounts found above and, finally, that those breaches confront Weyerhaeuser with other legally cognizable injuries entitling it to the declaratory relief awarded below.

3. The legal arguments to the contrary made by Premier were without merit. The Contract plainly and unambiguously required Premier to perform the specified scope of work for a specified lump sum payment. Premier failed to provide the promised scope of work and failed to earn the promised payment amounts. Premier's reliance on pre-contractual extrinsic evidence in support of its erroneous arguments was misplaced. The plain meaning and unambiguous terms of the fully integrated Contract clearly govern over the extrinsic materials relied upon by Premier. In addition, Arkansas law does not allow reliance on such extrinsic materials when offered to vary the terms of a plain and unambiguous written contract. *See Stokes v. Stokes*, 491 S.W.3d 113, 119 (Ark. 2016)(applying parol evidence rule); *Wochos v. Woolverton*, 378 S.W.3d 280, 289 (Ark. Ct. App. 2010)( parol evidence not allowed to vary terms of a clear contract containing an integration or merger clause). Premier's attempt to justify its material breach of the Extension Agreement (Ex. C-13) by analogizing its withdrawal to exercise of a "cooling off" period that, in some situations under Arkansas law, allows consumers to cancel certain kinds of contracts, *see, e.g.*, Ark. Code 4-89-107 (home solicitation contracts),

Final Award – 12

Ark. Code Ann.4-89-109 (health spa contracts), and Ark. Code Ann. 4-89-904 (residential real estate repair contracts), was also without legal merit. As found above, Premier is not a consumer and the Extension Agreement is a commercial, not a consumer, contract. Arkansas law does not provide for a "cooling off" period allowing a sophisticated and experienced commercial entity, such as Premier, to cancel a binding commercial contract, such as the Extension Agreement, with another commercial entity after entering into such a contract.

4. When confronted by Premier's sudden abandonment of the work, Weyerhaeuser acted reasonably to mitigate its damages. The contractual arrangements and amounts paid by Weyerhaeuser to secure replacement contractors to finish the scope of work left incomplete by Premier were reasonable as to terms and amounts. The monetary damages found above constitute damages directly resulting from Premier's breaches of the parties' agreements and are in an amount necessary to put Weyerhaeuser in the same position it would have been in if the parties' agreements had not been breached. *See Keith Capps Landscaping & Excavation, Inc. v. Van Horn Constr. Inc.*, 448 S.W.3d 2017, 211 (Ark. Ct. App. 2014); *Acker Constr. LLC v. Tran*, 396 S.W.3d 279, 288 (Ark. Ct. App. 2012).

5. Premier also materially breached the parties' agreements by failing to keep Weyerhaeuser's property free of liens. The monetary amounts found above that Weyerhaeuser has incurred to date to defend the Graybar Lien Foreclosure Action are reasonable and constitute additional damages directly resulting from Premier's breaches of the parties' agreements. The additional legal liabilities now facing Weyerhaeuser described above in paragraph II.A.14 directly result from Premier's breaches of the parties' agreements and, exercising my discretion under Section R-47 of the Rules, make it appropriate to include the declaratory relief set forth below in this Final Award.

6. Article 25.d of the parties' Contract provides that "[t]he prevailing party in an arbitration proceeding . . . is entitled to recover all of its dispute resolution costs, including reasonable attorneys' fees and costs." (Emphasis omitted.) Weyerhaeuser is the "prevailing party" in this arbitration within the meaning of Article 25.d of the Contract. Weyerhaeuser's attorneys' fees and dispute resolution costs, as found in Part II.A above, are reasonable in amount. Article 25.d entitles Weyerhaeuser to an award in its favor of those fees and expenses.

### D. FINAL RELIEF AWARDED.

Exercising the discretion and authority granted to me under Section R-47 of the Rules, I hereby award the following specific relief in this arbitration:

1. Claimant Weyerhaeuser NR Company is awarded monetary damages in the amount of $4,668,953.90 on its claims that Respondent Premier IEC, LLC committed material breaches of the parties' contracts.

2. Claimant Weyerhaeuser NR Company is also awarded the following declaratory relief on its claims that Respondent Premier IEC, LLC committed material breaches of the parties' contracts:

A. Claimant Weyerhaeuser complied with all pre-arbitration dispute resolution procedures required in Contract No. DAMP 10198.

B. Respondent Premier received both actual and "due" notice, as that term is used in the American Arbitration Association's Commercial Arbitration Rules, Section R-31, of this arbitration proceeding and has chosen not to appear or to seek a postponement. It was appropriate, and expressly permitted under Section R-31, for the arbitration to proceed to issuance of this Final Award despite Respondent's decision not to participate. This Final Award is not made solely on the default of Respondent Premier. Rather, Claimant Weyerhaeuser was required to, and did, submit evidence in support of its claims. The evidence submitted by Claimant is sufficient to support and establish the merits of those claims.

C. Respondent Premier committed material breaches of both Contract No. DAMP 10198 and the parties' Extension Agreement by failing to complete its contractual scope of work.

D. Respondent Premier also committed material breaches of both Contract No. DAMP 10198 and the parties' Extension Agreement by breaching Article 18 of that Contract by failing to keep liens from being placed on Weyerhaeuser's property.

E. Respondent Premier is legally obligated to satisfy all present and future liens related to its nonpayment of its suppliers at Weyerhaeuser's Dierks, Arkansas mill.

F. Respondent Premier is legally obligated to fully compensate Claimant Weyerhaeuser for all liens Weyerhaeuser has satisfied or will satisfy that relate to nonpayment of Premier's suppliers at Weyerhaeuser's Dierks, Arkansas mill, including but not limited to the liens of Graybar Electric Company, BlueLine Rental, Ozark Steel and Elliot Electric Supply.

G. Respondent Premier is legally obligated to fully compensate Claimant Weyerhaeuser for any fees and costs for which it becomes liable in the lien foreclosure suit brought by Graybar Electric Company, *Graybar Elec. Co. v. Weyerhaeuser Co. and Premier IEC, LLC*, No. 4:18-cv-04128-SOH (W.D. Ark., filed Sept. 11, 2018), and in any similar action filed by other lien holders, such as BlueLine Rental, Ozark Steel and Elliot Electric Supply.

3. Exercising the discretion granted to me under Section R-47(d) of the Rules ("The award of the arbitrator(s) may include: . . . ii. an award of attorneys' fees if . . . it is authorized by law or their arbitration agreement"), and taking into account Article 25.d of the parties' Contract ("The prevailing party in an arbitration proceeding . . . is entitled to recover all of its dispute resolution costs, including reasonable attorneys' fees and costs"), Claimant NR

Company is hereby awarded its reasonable attorneys' fees and dispute resolution costs incurred in this arbitration in the amount of $120,222.03.

    4.    The Rules, Section R-47(c), provide that "[i]n the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate." Exercising the discretion granted under these Sections of the Rules, and taking into account Article 25.d of the parties' Contract ("The prevailing party in an arbitration proceeding . . . is entitled to recover all of its dispute resolution costs, including reasonable attorneys' fees and costs;" emphasis omitted), I hereby determine and award that the administrative fees and expenses of the American Arbitration Association totaling $16,175.00, and the compensation and expenses of the arbitrator totaling $6,662.50, shall be borne by Respondent Premier IEC, LLC. Accordingly, Respondent Premier IEC, LLC shall pay Claimant Weyerhaeuser NR Company a total of $22,837.50 for such fees, expenses and compensation.

    4.    Respondent Premier IEC, LLC shall pay Claimant Weyerhaeuser NR Company the monetary amounts awarded above in paragraphs II.D.1, II.D.3 and II.d.4, totaling $4,812,013.40, within seven calendar days of the date of issuance of this Final Award.

### III.    **MISCELLANEOUS.**

This Final Award is in full and final satisfaction of all claims and issues submitted in this arbitration. All claims and requests for relief asserted by any party in this arbitration not specifically addressed in this Final Award are denied and are hereby dismissed with prejudice.

DATED this 11th day of March, 2019

_____
Thomas J. Brewer
Arbitrator

Final Award – 15